UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X

LBA INTERNATIONAL LIMITED,

                    Plaintiff,

          - against -

C.E. CONSULTING LLC and PATRICIA
BURNS,
                    Defendants.

-------------------------------------------------------X

**OPINION AND ORDER**

**08 Civ. 6797 (SAS)**



SHIRA A. SCHEINDLIN, U.S.D.J.:

## I.    INTRODUCTION

Plaintiff LBA International Limited ("LBA") brought suit against

defendants C.E. Consulting LLC[1] ("CEC") and Patricia Burns ("Burns"),

individually and doing business as CEC, for monies allegedly owed in connection

with a contract for the sale of body armor (bulletproof vests).  On October 20,

2009, plaintiff moved for summary judgment against Burns on its Second, Third

and Fourth Causes of action – Unjust Enrichment, Conversion, and Intentional

Interference with Contract, respectively.[2]  Plaintiff seeks damages in the amount of

---

[1]        The correct spelling of the first defendant's name  is "C E Consulting
LLC," without periods but with a space between the C and the E.

[2]        *See* 10/20/09 Notice of Motion for Summary Judgment and
accompanying documents, including Notice to Pro Se Litigant Who Opposes a

$265,119.10, plus costs and interest.[3] As directed by this Court, Burns opposed

plaintiff's motion for summary judgment with a letter dated February 18, 2010

("Opp. Ltr.").[4] Plaintiff then filed a Reply Memorandum of Law in Support of

Plaintiff's Motion for Summary Judgment Against Defendant Patricia Burns

("Reply").

In reviewing plaintiff's motion for summary judgment, a question

arose regarding subject matter jurisdiction. To resolve this jurisdictional query,

this Court issued an Order to Show Cause directing plaintiff to show cause why

the case should not be dismissed for lack of subject matter jurisdiction. Plaintiff

responded and argued that CEC is a dispensable party and that in order to preserve

_____

Motion for Summary Judgment ("Pro Se Notice"); Plaintiff's Rule 56.1 Statement
in Support of Motion for Summary Judgment ("Pl. 56.1"); Memorandum of Law
in Support of Plaintiff's Motion for Summary Judgment Against Defendant
Patricia Burns ("Pl. Mem."); Declaration of Christopher Carlsen, plaintiff's
counsel, dated October 20, 2009 ("Carlsen Decl."); and Declaration of Richard
Darby, owner and President of LBA, dated October 20, 2009 ("Darby Decl.").

[3]     *See* Notice of Motion.

[4]     Burns was informed that her opposition papers were due by February
19, 2010. *See* 1/26/10 Memorandum Opinion and Order. That Order also
contained the Court's standard notice entitled "Notice for Pro Se Litigants
Regarding Opposition to a Summary Judgment Motion." With its moving papers,
plaintiff also served its Pro Se Notice which included the text, verbatim, of Local
Civil Rule 56.1, Statements of Material Facts on Motion for Summary Judgment.
Accordingly, Burns was well-advised of what was needed to successfully oppose
plaintiff's motion.

diversity, this Court should dismiss CEC from this case. In a Memorandum

Opinion and Order dated January 26, 2010, CEC was dismissed from this lawsuit,

thereby allowing plaintiff to proceed solely against Burns. Consequently, the

Default Judgment against CEC, dated December 3, 2008, was vacated. I turn now

to the merits of plaintiff's summary judgment motion.

## II.   FACTS[5]

The late Paul Burns was Burns' husband and the President of CEC.[6]

On June 30, 2004, LBA and CEC entered into a contract for the sale of 2,355 suits

of upper body armor (bulletproof vests), to be manufactured by LBA and sold to

CEC (the "Contract").[7] The purchase price was negotiated in Pounds Sterling (£)

---

[5]     The facts are taken from plaintiff's Rule 56.1 Statement. Because
Burns has failed to controvert, much less respond to, plaintiff's Rule 56.1
Statement, the facts contained therein are deemed admitted. *See Giannullo v. City
of New York*, 322 F.3d 139, 140 (2d Cir. 2003) ("Rule 56.1 of the Local Civil
Rules of the United States District Courts for the Southern and Eastern Districts of
New York ('Local Rule 56.1') requires a party moving for summary judgment to
submit a statement of the allegedly undisputed facts on which the moving party
relies, together with citation to the admissible evidence of record supporting each
such fact. *See* Local Rule 56.1(a), (d). If the opposing party then fails to
controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact
will be deemed admitted. *See* Local Rule 56.1(c).").

[6]     Pl. 56.1 ¶¶ 2-3.

[7]     *See id.* ¶ 1. CEC had a separate contract with the United States Army
Joint Contracting Command - Iraq (the "JCCI") which agreed to purchase from
CEC the bulletproof vests CEC purchased from LBA. *See id.* ¶ 4.

3

and was set at £215 per vest, for a total contract price of £506,325.[8]  Pursuant to

the terms of the Contract, LBA manufactured and shipped the bulletproof vests

directly to JCCI in four separate shipments.[9]   LBA never received payment from

CEC for the fourth shipment which, at the then-prevailing exchange rate, totaled

approximately $265,119.10.[10]

On August 17, 2005, Paul Burns advised Darby that he received proof

of delivery of the fourth shipment from the JCCI and that he submitted CEC's

request for payment for this shipment.[11]  Paul Burns died on September 15, 2005.[12]

Burns notified Darby, by telephone, of Paul Burns' death in early October 2005.[13]

Shortly thereafter, on October 4, 2005, Darby sent an e-mail to Burns expressing

---

[8]      See id.

[9]      See id. ¶ 6.  The shipments were as follows:  (1) 600 vests shipped to
JCCI on August 16, 2004, LBA received payment from CEC on August 17, 2004;
(2) 825 vests shipped to JCCI on September 24, 2004, LBA received payment
from CEC on September 20, 2004; (3) 300 vests shipped to JCCI on April 12,
2004, LBA received payment from CEC on April 7, 2005; and (4) 630 vests
shipped to JCCI on August 8, 2005.  See id. ¶¶ 7-10.

[10]     See id. ¶¶ 11-12.

[11]     See id. ¶ 13.

[12]     See id. ¶ 14.

[13]      Plaintiff's Rule 56.1 Statement states, in error, that Burns telephoned
Darby in early October 2004. See id. ¶ 15. This error is also found in  Darby's
Declaration. See Darby Decl. ¶ 13.

4

his condolences and asking when the JCCI would make the final transfer.[14]  On

November 9, 2005, Darby sent Burns another e-mail stating: "Please call me as

soon as you can.  We do need to get an update as to the situation regarding the

payment as the delay is causing major problems to our cashflow."[15]  Burns

responded to Darby the next day, with an e-mail dated November 10, 2005,

informing him that the JCCI had not yet paid CEC for the fourth shipment and that

she was trying to resolve the payment issue.[16]  On November 13, 2005, Burns sent

Darby an e-mail advising him that someone from the JCCI sent her an e-mail

stating that the JCCI contracting office was looking into the reason for the delay in

payment.[17]  On December 9, 2005, Burns sent Darby another e-mail in which she

asked for the dates and number of vests in each shipment so she could relay that

information to Michael O'Connell, an employee of the JCCI  assisting in the

investigation of the missing payment.[18]

---

[14]     *See* Pl. 56.1 ¶ 16.  Darby sent this e-mail, and all other subsequent e-mails to Burns, using Paul Burns' e-mail address.  *See* Darby Decl. ¶ 14.

[15]     11/9/05 e-mail from Darby to "Patty," Ex. H to the Darby Decl. (Page 1 of 1).

[16]     *See* Pl. 56.1 ¶ 19.

[17]     *See id.* ¶ 20.

[18]     *See id.* ¶ 21.  In an e-mail dated December 14, 2005, Burns specifically informed O'Connell that CEC was owed $243,839 for the last

According to Darby, he made it clear to Burns that LBA had not been paid by CEC for the fourth and final shipment and that LBA was seeking payment from the funds to be paid by the JCCI to CEC for that shipment.[19]   Darby also stated that Burns told him that she was aware of the LBA-CEC Contract and that she was seeking payment from the JCCI so that both CEC and LBA could be paid for the final shipment.[20]

On January 4, 2006, the JCCI made a wire transfer of $243,839 into a bank account at the North Fork Bank in New York City held in the name "C E Consulting LLC" (the "North Fork Bank Account").[21]   After Paul Burns died, Burns exercised control over the North Fork Bank Account.[22]   After the wire transfer was made into the North Fork Bank Account, Burns transferred $240,000 of that money into a personal bank account she maintained at Chase Manhattan Bank ("Chase") as follows: $100,000 was transferred on January 13, 2006; $100,000 was transferred on January 23, 2006; and $40,000 was transferred on

shipment. *See id.* ¶ 23.

19      *See id.* ¶ 24 (citing Darby Decl. ¶ 18).

20      *See id.* ¶ 25 (citing Darby Decl. ¶ 18).

21      *See id.* ¶ 26.

22      *See id.* ¶ 33.

6

June 6, 2006.[23]  Burns used the $240,000 transferred into her Chase account for

personal expenditures.[24]  Prior to the JCCI wire transfer of $243,890, the North

Fork Bank Account had a balance of $51.61.[25]  After the JCCI wire transfer, the

North Fork Bank Account had a balance of $243,890.61 as of January 11, 2006.

After Burns withdrew $200,000 in January 2006, the North Fork Bank Account

had a balance of $43,841.61 as of January 31, 2006.[26]  As of May 31, 2006, the

North Fork Bank Account had a balance of $43,401.61.[27]  After Burns withdrew

$40,000 on June 6, 2006, the North Forth Bank Account had a balance of

$3,379.61, as of June 30, 2006.[28]

        In her opposition to plaintiff's motion, Burns describes the North

Fork Bank Account as her "husband's personal bank account" in which he

---

[23]     See id. ¶ 34.

[24]     See id. ¶ 35.

[25]     See id. ¶ 36.

[26]     See Plaintiff's Exhibit 9, marked at the August 10, 2009 Deposition
of Patricia Burns ("Burns Dep."), attached as Ex. C to the Carlsen Decl.  A service
fee of $49.00 was also deducted in January 2006.  See id.

[27]     See id.  The difference of $440 ($43,841.61 - $43,401.61) is
presumably due to the imposition of service charges and other fees in the interim
period between January and June of 2006.

[28]     See id.  A service fee of $22.00 was also deducted in June 2006.  See
id.

deposited money from other ventures to be used for the payment of expenses such as rent and tuition.[29] Burns acknowledges that after her husband's death, she used money from the North Fork Bank Account for "similar purposes."[30] Burns argues that she did not cause CEC to breach its contract with LBA because the final payment from the JCCI represented CEC's profit under the Contract. Burns explains as follows:

> I continue to assert that I was under the impression and continue to believe that CE Consulting always paid in advance for goods purchased from LBA International. The exhibits prove this. The overdue final payment from the US government, which LBA helped me clear up was my husband's profit and I utilized it as such.[31]

On June 4, 2006, Darby learned of the JCCI's January 4, 2006 wire transfer to the North Fork Bank Account, having obtained from the JCCI a copy of its June 4, 2006 "Memorandum for Record," which memorialized the details of its $243,839 payment to CEC.[32] Shortly thereafter, Darby advised Burns, by e-mail, of the JCCI wire transfer.[33] Burns responded to Darby with an e-mail dated June

---

[29]    Opp. Ltr. at 2.

[30]    *Id.*

[31]    *Id.*

[32]    *See* Darby Decl. ¶ 19 and Ex. K attached thereto.

[33]    *See* Darby Decl. ¶ 20 and Ex. L attached thereto.

6, 2006, which states: "I checked the bank. No new transfer."[34]

## III.   LEGAL STANDARDS

### A.   Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[35] "'An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. A fact is material if it might affect the outcome of the suit under the governing law.'"[36] "[T]he burden of demonstrating that no material fact exists lies with the moving party . . . ."[37]

"When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the

---

[34]    *See* Ex. L to Darby Decl.

[35]    Fed. R. Civ. P. 56(c)(2).

[36]    *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009) (quoting *Roe v. City of Waterbury*, 542 F.3d 31, 34 (2d Cir. 2008)).

[37]    *Miner v. Clinton County, N.Y.*, 541 F.3d 464, 471 (2d Cir. 2008) (citing *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007)).

trier of fact on an essential element of the nonmovant's claim."[38]  To do so, the

non-moving party must do more than show that there is "'some metaphysical

doubt as to the material facts,'"[39] and "'may not rely on conclusory allegations or

unsubstantiated speculation.'"[40]  However, "'all that is required [from a non-

moving party] is that sufficient evidence supporting the claimed factual dispute be

shown to require a jury or judge to resolve the parties' differing versions of the

truth at trial."[41]

        In determining whether a genuine issue of material fact exists, the

court must "constru[e] the evidence in the light most favorable to the non-moving

party and draw all reasonable inferences" in that party's favor.[42]  However, "'only

admissible evidence need be considered by the trial court in ruling on a motion for

_____

[38]     *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).

[39]     *Higazy v. Templeton*, 505 F.3d 161, 169 (2d Cir. 2007) (quoting
*Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

[40]     *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005)
(quoting *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001)).

[41]     *Kessler v. Westchester County Dep't of Soc. Servs.*, 461 F.3d 199,
206 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49
(1986)).

[42]     *Sledge v. Kooi*, 564 F.3d 105, 108 (2d Cir. 2009) (citing *Anderson*,
477 U.S. at 247-50, 255).

10

summary judgment.'"[43] "Credibility assessments, choices between conflicting

versions of the events, and the weighing of evidence are matters for the jury, not

for the court on a motion for summary judgment.'"[44]

## B.   Unjust Enrichment

There are three elements of an unjust enrichment claim under New

York law.[45] "To prevail on a claim for unjust enrichment in New York, a plaintiff

must establish (1) that the defendant benefitted; (2) at the plaintiff's expense; and

(3) that equity and good conscience require restitution."[46] "'The theory of unjust

enrichment lies as a quasi-contract claim.  It is an obligation the law creates *in the*

*absence of any agreement*.'"[47]

Quasi-contract is an obligation imposed by law, in the

---

[43]   *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d
244, 264 (2d Cir. 2009) (quoting *Raskin v. Wyatt Co.*, 125 F.3d 55, 65 (2d Cir.
1997)).

[44]   *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (quoting *Fischl
v. Armitage*, 128 F.3d 50, 55 (2d Cir. 1997)).  *Accord Anderson*, 477 U.S. at 249.

[45]   *See Beth Israel Med. Ctr. v. Horizon Blue Cross and Blue Shield of
N.J., Inc.*, 448 F. 3d 573, 586 (2d Cir. 2006).

[46]   *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000) (quotation
marks and citation omitted).

[47]   *Beth Israel*, 448 F.3d at 586-87 (quoting *Goldman v. Metropolitan
Life Ins. Co.*, 5 N.Y.3d 561, 572 (2005) (citations omitted; emphasis in original)).

> absence of a valid and enforceable contract, because of the
> conduct of the parties or some special relationship between
> them, to prevent unjust enrichment. For example, "[w]hen
> two parties have bargained with each other on the terms of
> a contract but have failed to create an enforceable contract,
> whether because of failure to reach a meeting of the minds
> on terms or because of noncompliance with some formal
> requisite of contract law," and one party has conferred a
> benefit on the other, that party may seek recovery in
> quasi-contract.[48]

However, claims for unjust enrichment and breach of contract are mutually

exclusive. As explained by the New York Court of Appeals:

> The existence of a valid and enforceable written contract
> governing a particular subject matter ordinarily precludes
> recovery in quasi contract for events arising out of the
> same subject matter. A "quasi contract" only applies in the
> absence of an express agreement, and is not really a
> contract at all, but rather a legal obligation imposed in
> order to prevent a party's unjust enrichment. . . . Briefly
> stated, a quasi-contractual obligation is one imposed by
> law *where there has been no agreement or expression of
> assent, by word or act, on the part of either party involved*
> . . . .
>
> Of course, a party may perform a contract under protest,
> and then sue for damages resulting from the second party's
> breach. Alternatively, where rescission of a contract is
> warranted, a party may timely rescind and seek recovery on
> the theory of quasi contract. It is impermissible, however,

---

[48]     *Capital Distribution Servs., Ltd. v. Ducor Exp. Airlines, Inc.*,
440 F. Supp. 2d 195 (E.D.N.Y. 2006) (quoting *U.S. East Telecomms., Inc. v. U.S.
West Commc'ns Servs.*, 38 F.3d 1289, 1299 (2d Cir. 1994)) (quotation marks
added).

> to seek damages in an action sounding in quasi contract where the suing party has fully performed on a valid written agreement, the existence of which is undisputed, and the scope of which clearly covers the dispute between the parties.[49]

## C.  Conversion

"To establish a claim of conversion under New York law, a 'plaintiff

must show legal ownership or an immediate superior right of possession to a

specifically identifiable thing and must show that the defendant exercised [an]

unauthorized dominion over the thing in question to the exclusion of the plaintiff's

rights.'"[50]  "'Money may be the subject of conversion if it is specifically

identifiable and there is an obligation to return it or treat it in a particular

manner.'"[51]  "'When funds are provided for a particular purpose, the use of those

---

[49]      *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 388-89 (1987) (citations omitted, emphasis in original).

[50]      *Capital Distribution* , 440 F. Supp. 2d at 207-08 (quoting *Batsidis v. Batsidis*, 778 N.Y.S.2d 912 (2d Dep't 2004) (quotation marks added, ellipsis deleted in original)). *Accord Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 403–04 (2d Cir. 2006) ("According to New York law, '[c]onversion is the unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights.'") (quoting *Vigilant Ins. Co. of Am. v. Housing Auth. of the City of El Paso, TX*, 87 N.Y.2d 36, 44 (1995) (quotation marks and citations omitted)).

[51]      *Capital Distribution*, 440 F. Supp. 2d at 208 (quoting *Hoffman v. Unterberg*, 780 N.Y.S.2d 617, 619 (2d Dep't 2004) (quotation marks added)).

13

funds for an unauthorized purpose constitutes conversion.'"[52] Money may

therefore be the subject of conversion. But it must be specific, identifiable money,

not fungible money that is generally available to satisfy a debt owed by a

defendant. As explained below,

> "money can clearly be subject to conversion. Similarly,
> money can be the subject of statutory theft. The plaintiffs
> must establish, however, legal ownership or right to
> possession of specifically identifiable moneys. . . . [A]n
> action for conversion of funds may not be maintained to
> satisfy a mere obligation to pay money. . . . It must be
> shown that the money claimed . . . belonged to the plaintiff
> and that the defendant converted it to his own use. Thus,
> the requirement that the money be identified as a specific
> chattel does not permit as a subject of conversion an
> indebtedness which may be discharged by the payment of
> money generally. . . . A mere obligation to pay money may
> not be enforced by a conversion action . . . and an action in
> tort is inappropriate where the basis of the suit is a
> contract, either express or implied. Consistent with this
> rule, in our case law sustaining a cause of action wherein
> money was the subject of the conversion or theft, the
> plaintiffs in those cases at one time had possession of, or
> legal title to, the money."[53]

---

[52]     *Id.* (quoting *Hoffman*, 780 N.Y.S.2d at 619) (quotation marks added).

[53]     *In re Abbott*, No. 09-20282, 2009 WL 5184710, at \*4 (Bankr. D.
Conn. Dec. 22, 2009) (quoting *Deming v. Nationwide Mut. Ins. Co.*, 279 Conn.
745, 771-72 (Conn. 2006) (quotation marks and citations omitted in original,
ellipses and brackets in original)).

## D.   Intentional Interference with Contract

"Under New York law, the elements of tortious [intentional] interference with contract are (1) 'the existence of a valid contract between the plaintiff and a third party'; (2) the 'defendant's knowledge of the contract'; (3) the 'defendant's intentional procurement of the third-party's breach of the contract without justification'; (4) 'actual breach of the contract'; and (5) 'damages resulting therefrom.'"[54]

## IV.   DISCUSSION

### A.   Unjust Enrichment

Plaintiff's first cause of action is for breach of contract.[55]   In its Complaint, plaintiff alleges that "Patricia Burns was and is an owner and operator of C.E. Consulting."[56]   Thus, in seeking recovery, plaintiff relies, in part, on the existence of an express, written agreement between LBA and CEC. But that Contract was signed by Darby, on behalf of LBA, and Paul Burns, on behalf of CEC.  It was not signed by Burns who, at the time, had nothing to do

---

[54]   *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401-02 (2d Cir. 2006) (quoting *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 424 (1996)).

[55]   Complaint dated July 29, 2008, Ex. A to the Carlsen Decl.,  ¶¶ 30-33.

[56]   *Id.* ¶ 9.

15

with CEC. There is no evidence that Burns owned or operated CEC, or did business as CEC, at the time the Contract was executed. Because there was no contract between LBA and Burns, plaintiff may bring a quasi-contract claim for unjust enrichment against Burns. Clearly, plaintiff has met the three elements of an unjust enrichment claim: (1) Burns benefitted financially; (2) at LBA's expense; and (3) there is no reason why Burns should not make full restitution to LBA.[57] Accordingly, summary judgment is granted with respect to plaintiff's unjust enrichment claim against Burns.

## B. Conversion

While money may be the subject of a conversion claim, it must be specifically identifiable. A general claim for money damages will not suffice. Although the funds that LBA is claiming it was entitled to were deposited in the North Fork Bank Account, hypothetically, Burns could have satisfied CEC's debt to LBA, or a Judgment in LBA's favor, from monies held in other bank accounts or by liquidating personal assets, for example. Because the alleged indebtedness could have been discharged by the payment of money in general, a claim for conversion does not lie. Plaintiff's conversion claim is therefore dismissed.

---

[57] *See Kaye*, 202 F.3d at 616.

16

## C.    Intentional Interference with Contract

Plaintiff has met all of the elements for an intentional interference

with contract claim under New York law. It is beyond dispute that a contract

existed between LBA and CEC and that Burns had knowledge of that Contract. It

is also beyond dispute that CEC breached that Contract by its failure to pay LBA

for the fourth shipment and that damages resulted from that breach. Thus, the only

element that could possibly be in dispute is the third element – Burns' intentional

procurement of CEC's breach of the Contract without justification.

Burns argues that she thought the amount of the JCCI wire transfer –

$243,839 – represented CEC's profit on the Contract and, therefore, she was free

to use that money at her discretion. But Burns' argument is specious and clearly

belied by the e-mails sent by Darby, time and time again, inquiring as to the status

of the JCCI payment. If LBA had been paid in full, Darby would have had no

reason to contact Burns regarding the final payment from the JCCI. The only

conclusion that can be drawn from Darby's e-mails and Burns' responses is that

LBA's payment from CEC was inextricably linked to the payment CEC was to

receive from the JCCI, a fact of which Burns was aware.

While Burns argued that the North Fork Bank Account was used by

her late husband as his personal checking account, she acknowledged at her

17

deposition that CEC's only bank account was the North Fork Bank Account.[58]

Accordingly, by depleting the North Fork Bank Account of most of its funds,

Burns in effect bankrupted CEC, thereby preventing CEC from making any

significant payment to LBA. Burns therefore intentionally caused CEC to breach

its Contract with LBA.[59] Her motive in doing so is clear – personal financial gain

at LBA's expense. Because there are no issues of material fact with regard to

plaintiff's intentional interference claim, summary judgment is granted in

plaintiff's favor on this claim.

## V. CONCLUSION

Plaintiff's motion for summary judgment is granted as to its Second

and Fourth Causes of Action - Unjust Enrichment and Intentional Interference

with Contract. Plaintiff's Third Cause of Action, for Conversion, is dismissed.

Plaintiff is awarded damages in the amount of $265,119.10. Plaintiff also requests

costs and interest. Costs other than attorney's fees are generally awarded to the

prevailing party under Federal Rule of Civil Procedure 54(d)(1). A list of taxable

costs can be found in section 1920 of Title 28 of the United States Code.

---

[58]     *See* Burns Dep. at 31-32.

[59]     Furthermore, although not an element of a tortious interference claim,
Burns acted with malice as demonstrated by the fact that she lied to Darby about
the JCCI wire transfer on the very day that she withdrew the remaining $40,000.

18

That leaves the question of prejudgment interest. "In a diversity case, state law governs the award of prejudgment interest."[60] This is so because "[t]he availability of prejudgment interest is a substantive, rather than procedural, question."[61] Under New York law, "[i]nterest shall be recovered upon a sum awarded because of a breach of performance of a contract, or because of an act or omission depriving or otherwise interfering with title to, or possession or enjoyment of, property . . . ."[62] Moreover, "[i]nterest shall be computed from the earliest ascertainable date the cause of action existed."[63] Because the majority of Burns' interference was accomplished by January 23, 2006, interest will be awarded from that date to the date judgment is entered at the rate of nine (9%) percent.

Accordingly, costs and prejudgment interest are awarded to the extent set forth above. Plaintiff shall submit a bill of costs and a proposed Judgment, on notice, forthwith. On fourteen days' notice, the Clerk of the Court shall enter Judgment, after taxing costs, and shall include the amount of costs taxed in the

---

[60]     *Schipani v. McLeod*, 541 F.3d 158, 164 (2d Cir. 2008).

[61]     *Adams v. Lindblad Travel, Inc.*, 730 F.2d 89, 93 (2d Cir. 1984).

[62]     N.Y. C.P.L.R. § 5001(a).

[63]     *Id.* § 5001(b).

19

Judgment.  The Clerk of the Court is directed to close the instant motion

(Document # 17).

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            March 5, 2010

## - Appearances -

### For Plaintiff:

Christopher Carlsen, Esq.
Clyde & Co US LLP
The Chrysler Building
405 Lexington Avenue
New York, NY 10174
(212) 710-3900

### Defendant (Pro Se):

Patricia Burns
345 East 93rd Street
Apt. 7A
New York, NY 10128
(212) 472-2035